

FILED

MAR 26 AM 11: 57

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER BOEGEMAN,

                Petitioner,

v.

CHRIS SMITH, et al.,

                Respondent.

Case No.: 17cv0861 GPC (KSC)

**REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.    **INTRODUCTION**

Petitioner Christopher Boegeman has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet.") challenging his convictions in San Diego Superior Court case no. SCN339497 for grand theft. (Pet., ECF No. 1.)[1] Boegeman contends his due process rights were violated when the jury was improperly instructed. (*Id.* at 6, 32-48.)

The Court has read and considered the Petition, the Memorandum of Points and Authorities in Support of the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer ("Answer") [ECF No. 6-1], the lodgments, and the

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system, except for lodgments.

legal arguments presented by both parties.  For the reasons discussed below, the Court **RECOMMENDS** the Petition be **DENIED**.

## II.  FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate court recounted the facts as follows:

> Boegeman and David Schroeder shared an apartment in Escondido. Boegeman provided caretaking services to Schroeder in exchange for room and board.  Their neighbor, Douglas Goll, bought and sold items on eBay for them and kept two percent of the proceeds of the items he sold as a commission.  Boegeman and Schroeder told Goll they did not want to sell items in their own names because they did not want to show income that would jeopardize their HUD housing.
>
> In April 2014, Boegeman and Schroeder approached Goll together and discussed buying and selling silver online.  Boegeman told Goll that if he did not sign the UPS or FedEx confirmation of delivery slip when silver was delivered, he could claim he had not received it.  Schroeder likewise said that by not signing for a delivered item he could claim it was never delivered or was stolen.  He said he always claimed his packages were stolen from his apartment.  In separate conversations, Boegeman and Schroeder both told Goll that by not signing for purchased products, a person could either get a refund and keep the product or get a duplicate and have two products.  Boegeman and he once signed his name as Mickey Mouse.
>
> Following these conversations, Boegeman and Schroeder asked Goll to bid on a set of silver on eBay.  When the price reached about $3,850, Goll asked Schroeder for the money to purchase the silver at that price. Schroeder used Boegeman's credit card to pay for the silver, eBay initially accepted the card, but later cancelled the transaction.
>
> In April 2014, Schroeder called Dean Gannon to inquire about a set of sterling silver flatware that Gannon's family antique business was marketing on eBay.  After an extensive conversation, Gannon agreed to sell the silver

2

to Schroeder for approximately $8,145 and ship it to him. Schroeder paid for the silver with a Visa credit card and Gannon entered the card number into his register machine. The charge was accepted and Gannon shipped the silver to Schroeder through FedEx. The delivery address was Schroeder's apartment, 1121 Morning View Drive, Apartment [1]05 in Escondido. Gannon purchased insurance for the shipment from FedEx that would reimburse him up to $1000 plus the cost of shipping if the shipment were lost or damaged.

FedEx driver Steven Milner delivered the package containing the silver to Schroeder and Boegeman's apartment on April 26, 2014. When Milner knocked on the door, Boegeman opened the door and identified himself as David Schroeder. Because Boegeman stated the full name of the addressee on the package and Milner was at the specified delivery address, Milner did not ask Boegeman for identification. Milner testified that there was another man in the apartment "just sitting there in the background." Milner remembered having a brief conversation with Boegeman in which Milner complained about having to work on a Saturday and Boegeman responded, "At least you have a job." Milner had seen Boegeman on prior occasions when he made deliveries but had never spoken with him before April 26, 2014.

Sometime after April 26, 2014, Schroeder called his credit card company and reported that he had not received the silver he ordered from Gannon. Consequently, Visa reversed the charge and withdrew the money that had been paid into Gannon's account for the silver. Gannon then opened a fraud claim with FedEx and collected insurance proceeds from FedEx of $1000 plus the cost of shipping the silver.

Gannon also called investigator Scott Tolstad of the Escondido Police Department regarding the possible theft of the silver he had shipped to Schroeder. Tolstad contacted a FedEx investigator who told him Milner was the driver who delivered the silver to Schroeder and Boegeman's address. When Tolstad initially contacted Milner by phone, Milner told Tolstad he remembered making the delivery and thought he would be able to identify the person who accepted the package. Tolstad later showed Milner a "six-pack" of DMV photographs. One of the photographs was of Boegeman and the other five were of similar looking men. Milner circled the photograph of Boegeman and noted on the six-pack that he recognized Boegeman from the delivery on Morning View Drive. Milner told Tolstad that Boegeman was the person who signed for the package.

At trial, Milner testified that a week or two after he delivered the silver to Boegeman, he made another delivery to the same address but "[i]t was a totally different name." The first two times he attempted to make the delivery, there was a note on the door instructing him to "take it to somewhere else." Milner "didn't feel safe in doing that," so he made a third attempt to deliver it to Schroeder and Boegeman's apartment. On the third attempt, the other man Milner had seen in the apartment on April 26 opened the door. Milner told the man he need[ed] to see identification before he would release the package. At that point, "the other gentleman came up and was angry that [Milner] wouldn't let him sign for it." Both men refused to show identification and one of them eventually closed the door on Milner because he refused to release the package.

Boegeman testified at trial that he and Schroeder left Escondido on Friday, April 25, 2014, and did not return to their apartment until around 11:00 p.m. on Sunday, April 27, 2014. They spent the weekend going to yard sales in Pasadena and Long Beach and helping their friend Tanya Williams-Mahee buy merchandise to sell at swap meets. Williams-Mahee also provided caretaking services to Schroeder. Before they left on Friday, their upstairs neighbor Cynthia Omey asked them to watch her dog for the weekend. Boegeman told her they could not watch the dog because they had other plans for the weekend.

Boegeman testified that he first encountered Milner a couple of months before the weekend of April 26, 2014, and had two other encounters with Milner before that weekend. In the first encounter he asked Milner to leave packages at the rental office for the apartment complex and to stop leaving them on Boegeman's patio or door. Milner responded that it was "none of [Boegeman's] effing business to tell him how to do his job." If he [had] a problems, take it up with corporate."

The second encounter was a "screaming match." Boegeman told Milner he was "getting really tired of [his] packages coming up missing and seeing these signs saying that [Milner] delivered something when it was never there. And being accused of something." Boegeman asked Milner multiple times to leave deliveries at the rental office. Milner said that was not his job. "His job is to throw it there and keep going. He doesn't care."

In the third encounter, Boegeman complained to Milner about a package that "never showed up." Milner said that he had left the package and that Boegeman was ignorant. Boegeman responded, "[W]ell, if you

weren't working, we should step outside and handle this because I'm missing packages that, you know, belong to me and I have paid and I use." Boegeman called FedEx "corporate" and discussed the matter with them. Boegeman testified that he and Schroeder had lost about $10,000 worth of missing items as a result of FedEx's misplacing their packages throughout the years.

Schroeder testified that he was with Boegeman and Williams-Mahee in Los Angeles the weekend of April 25, 2014. The silver he purchased from Gannon was supposed to have been delivered that Saturday. On Monday, Schroeder called FedEx and was told the package had been delivered next door. He went next door with Williams-Mahee, but the package was not there. He then called his credit card company and was told they would contact Gannon to determine whether he would refund Schroeder's money because Schroeder had not received the merchandise. Schroeder never got the silver. Regarding Boegeman's previous conflict with a delivery man, Schroeder testified that a FedEx delivery man was not nice to him, and he thought "that's what made [Boegeman] mad. It also made [the FedEx driver] mad. He was nasty the way he responded."

Williams-Mahee testified that she was in Los Angeles on the 25th, 26th and 27th of April 2014 and was shopping in downtown Los Angeles with Boegeman and Schroeder on Saturday the 26th around 4:00 to 6:00 p.m. They went their separate ways Saturday night and did not see each other again until Sunday evening, when they met before driving back to Escondido.

Omey, whose apartment was above Schroeder and Boegeman's apartment, testified that a couple of days before April 25, 2014, she asked Boegeman and Schroeder if they would watch her dog over the coming weekend because she and her husband were going to be visiting their daughter in Pasadena over the weekend. They told her they could not watch her dog because they were also going to be in Pasadena. Around 6:00 to 6:30 a.m. on Saturday, April 26, Omey rattled the doorknob to Schroeder and Boegeman's apartment to make sure it was locked before she left for Pasadena. The door was locked and no one came to the door. When she returned on Sunday evening, there was an unsigned "Post-it-type" note on her door from FedEx that read, "I left a package for Apartment No. 105. You signed for it!" The note was underscored several times. Omey gave the note to Schroeder.

To rebut Boegeman's alibi defense, the prosecution called Don Holmes, an investigator for the San Diego County District Attorney's Office, to testify as an expert on cellphone records and technology. He explained that a phone company always knows where a phone is being used because "the phone is always sending and receiving radio signals from cellphone towers that [the] carrier has set up throughout the general geographical area that [the user] lives in." Holmes analyzed records of calls made from and received by Boegeman's cellphone between April 25 and April 27, 2014. He testified and presented a power point presentation showing that all of the phone's outgoing and incoming calls during that time period connected to cellphone towers in the Escondido area or Temecula area. The phone did not make or receive any calls in the Los Angeles area.

In surrebuttal, Boegeman testified that the cellphone in question was not in his possession from April 25 through April 27, 2014. He left the phone with a neighbor that weekend who had asked him if she could use it to contact her son. He did not recognize any of the phone numbers listed in Holmes's power point presentation.

(Lodgment No. 1, ECF No. 7-1 at 1-3.)

## III.  **PROCEDURAL BACKGROUND**

On March 11, 2015, the San Diego District Attorney's Office filed a complaint charging Christopher Boegeman with one count of grand theft. (Lodgment No. 8, ECF No. 7-14 at 7-9.) Following a jury trial, Boegeman was found guilty. (*Id.* at 93.) Boegeman was sentenced to one hundred and eighty days in jail. (*Id.* at 107.)

Boegeman appealed his conviction to the California Court of Appeal. (Lodgment Nos. 2-4, ECF Nos. 7-2–7-4.) The state appellate court upheld Boegeman's conviction in a written, unpublished opinion. (Lodgment No. 1, ECF No. 7-1.) Boegeman filed a petition for review in the California Supreme Court, which was summarily denied. (Lodgment Nos. 5-6, ECF Nos. 7-5–7-6.)

Boegeman filed a Petition for Writ of Habeas Corpus in this Court on April 27, 2017, and Respondent filed an Answer, Memorandum of Points and Authorities in Support of the Answer and Lodgments on August 7, 2017. (ECF Nos. 1, 6, 6-1.) Boegeman did not file a Traverse.

# IV. **DISCUSSION**

In his Petition, Boegeman contends the jury instructions given to the jury in his case violated his Fourteenth Amendment due process rights because they included an invalid legal theory and because they told the jury Boegeman could be found guilty as an aider and abettor but did not include a definition of aiding and abetting. (Pet., ECF No. 1 at 6, 32-48.) Respondent contends Boegeman has not stated a valid federal constitutional claim as to either ground and, in any event, the state court's resolution of Boegeman's claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 6-1 at 1-26)

A. *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified

the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) *(overruled on other grounds by Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

B. *Analysis*

Boegeman contends he is entitled to habeas corpus relief because the jury was improperly instructed in two different ways. First, he claims the jury could have convicted him under an invalid legal theory because they were instructed with the crime of larceny. The facts, he contends, could not have supported such a conviction. (Pet., ECF No. 1 at 32-40.) Second, Boegeman argues the jury was told they could convict him of grand theft as an aider and abettor but were not given a definition of aiding and abetting. The jury was therefore not informed that in order to be guilty as an aider and abettor, the defendant must know of the perpetrator's purpose and must act with the intent to commit or facilitate the crime. (*Id.* at 41-48.)

1      *1. Larceny Instruction*

2      The prosecution contended at trial that Schroeder and Boegeman together crafted a

3      plan to buy silver flatware from Gannon then claim the silver was never delivered.

4      Schroeder and Boegeman would then have both the silver flatware and the money.  In

5      claim one, Boegeman contends the jury instructions contained an legally invalid theory of

6      guilt and the jury could have convicted him using that legally invalid theory.  (Pet., ECF

7      No. 1 at 6, 32-40.)  Specifically, he claims the jury should not have been instructed on the

8      crime of larceny because under the facts of his case, he could not have been legally

9      convicted of such a crime.  (*Id.*)  Respondent contends Boegeman has not stated a federal

10     constitutional claim because the error was one of state, not federal law, and in any event,

11     the state court's conclusion that the error was harmless was reasonable.  (Answer, ECF

12     No. 6-1 at 12-18.)

13     Boegeman raised this claim in the petition for review he filed in the California

14     Supreme Court, which summarily denied it.  (Lodgments Nos. 5-6, ECF Nos. 7-5–7-6.)

15     Accordingly, this Court must "look through" to the state appellate court's decision

16     denying the claim as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.  That court

17     wrote:

18     
19           The theory that Boegeman committed theft by larceny is invalid
       because the trial evidence supported only the prosecution's main theory that
       Boegeman participated in a theft by false pretenses.  Because the crime of
20     theft by false pretenses was completed before the silver was delivered to
       Boegeman and Schroeder, the silver could not later become the subject of a
21     theft by larceny upon delivery.

22     
23           In *People v. Williams* (2013) 57 Cal.4th 776 (*Williams*), the California
       Supreme Court explained that "theft by false pretenses, unlike larceny, has
24     no requirement of asportation.  The offense requires only that '(1) the
       defendant made a false pretense or representation to the owner of property;
25     (2) with the intent to defraud the owner of that property; and (3) the owner
       transferred the property to the defendant in reliance on the representation.'
26     [Citation.]  The crime of theft by false pretenses ends at the moment title to
       the property is acquired . . . ."  (*Id.* at p. 787, second italics added.)
27

28

Consequently, a completed theft by false pretenses "cannot become robbery by the defendant's later use of force or fear." (*Ibid.*)

In this case, the theft by false pretenses ended the moment title to the silver passed to Schroeder. Under the law governing shipment contracts, title passed to Schroeder when Gannon shipped the silver. California Uniform Commercial Code section 2401, subdivision (2) provides, in part, that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . and in particular . . . [¶] (a) If the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but [¶] (b) If the contract requires delivery at destination, title passes on tender there." "Thus, when the parties agree to or contemplate shipment by the seller, title passes to the buyer upon that shipment, unless the agreement specifically requires the seller to make delivery at the destination." (*California State Electronics Assn. v. Zeos International Ltd.* (1996) 41 Cal.App.4th 1270, 1277.)

A contract under which the seller takes a telephone order and ships the goods at the buyer's expense, like Schroeder's contract to purchase silver from Gannon, is presumptively a shipment contract. [FN omitted] (*California State Electronics Assn. v. Zeos International Ltd.*, *supra*, 41 Cal.App.4th at p. 1277.) A shipment contract is regarded as the normal contract under the Uniform Commercial Code; a destination contract is the regarded as the variant type. (*Wilson v. Brawn of California, Inc.* (2005) 132 Cal.App.4th 549, 555 (*Wilson*).) "'The seller is not obligated to deliver at a named destination and bear the concurrent risk of loss until arrival, unless he has specifically agreed so to deliver or the commercial understanding of the terms used by the parties contemplates such a delivery.'" (*Ibid.*, quoting *Official Comments on U. Com. Code*, Deering's Ann. Cal. U. Com. Code (1999 ed.) foll. § 2503, p. 198.) [FN omitted].

There was no evidence at trial indicating the contract between Gannon and Schroeder for the purchase of Gannon's silver was anything other than a standard shipping contract, under which title to the silver passed to Schroeder when Gannon shipped the silver. Thus, the uncontroverted evidence established that when Gannon shipped the silver the theft by false pretenses was complete. The crime could not later become a theft by larceny when a perpetrator of the theft by false pretenses received and asported the stolen property.

Williams discussed "another significant difference between larceny and theft by false pretenses . . . . [L]arceny requires a 'trespassory taking,' which is a taking without the property owner's consent. [Citation.] . . . By contrast, theft by false pretenses involves the consensual transfer of possession as well as title of property; therefore, it cannot be committed by trespass." (*Williams, supra*, 57 Cal.4th at p. 788.) Williams added that "unlike the offense of larceny by trick, in which a defendant's fraud vitiates the consent of the victim as a matter of law, the acquisition of title involved in the crime of theft by false pretenses precludes a trespass from occurring." (*Williams, supra*, 57 Cal.4th at pp. 788–789, citing and discussing *People v. Beaver* (2010) 186 Cal.App.4th 107, 121 (*Beaver*) [in trial of defendant convicted of grand theft for staging an accident at his place of employment to obtain medical expenses for a preexisting injury, it was reversible error to instruct the jury on theft by larceny instead of theft by false pretenses because the employer consented to pay for the defendant's medical treatment; therefore the defendant did not commit a trespassory taking, and hence did not commit larceny].)

In the present case, there was no trespassory taking because Schroeder's acquisition of title precluded a trespassory taking from occurring. In the words of the *Beaver* court, "Notwithstanding the fact the offense of theft by false pretenses, like all other theft offenses, has been consolidated into the single crime of theft as defined in section 484, the essential elements of the individual theft offenses remain the same. [Citation.] The present matter did not involve a taking of property from another without his consent. . . . This was theft by false pretenses, not larceny." (*People v. Beaver, supra*, 186 Cal.App.4th at p. 121.)

The evidence in this case supports only the crime of theft by false pretenses, which was completed when Gannon shipped the silver. It was not possible for Boegeman to commit theft by larceny against Gannon when the silver was delivered because Gannon had relinquished both possession and title. The only possible way Boegeman's taking of the silver from Milner could be a theft by larceny would be if Boegeman had taken the package with the intent to steal it from Schroeder. However, the prosecution clearly did not proceed on that theory and did not present any evidence that Boegeman stole the silver from Schroeder or anyone else other than Gannon.

This raises the question of whether the theft by larceny theory and jury instruction was a *legally* invalid theory, as Boegeman argues, or merely a *factually* invalid theory. We conclude the theft by larceny instruction was

11

factually invalid rather than legally invalid. In *People v. Perez* (2005) 35 Cal.4th 1219, 1233 (*Perez*), the California Supreme Court explained: "The nature of . . . harmless error analysis depends on whether a jury has been presented with a legally invalid or a factually invalid theory. When one of the theories presented to a jury is legally inadequate, such as a theory which ' "fails to come within the statutory definition of the crime" ' [citations], the jury cannot reasonably be expected to divine its legal inadequacy. The jury may render a verdict on the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime. In such circumstances, reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.' [Citation.]

"In contrast, when one of the theories presented to a jury is factually inadequate, such as *a theory that, while legally correct, has no application to the facts of the case*, we apply a different standard. [Citation.] In that instance, we must assess the entire record, 'including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict.' [Citation.] We will affirm 'unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory.' " (*Perez, supra*, 35 Cal.4th at p. 1233, italics added.)

In *People v. Guiton* (1993) 4 Cal.4th 1116 (*Guiton*), the California Supreme Court explained: "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground. But if the inadequacy is legal, not merely factual, that is, when the facts do not state a crime under the applicable statute, . . . the . . . rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Id.* at p. 1129.)

Here, the improperly presented theft by larceny theory was not *legally* invalid – i.e., it was not a case where the facts do not state a crime under the applicable statute. The jury could apply the facts of the delivery literally to the larceny instruction and conclude the elements of larceny were satisfied, not knowing that Boegeman's taking the package from Milner could not constitute a theft by larceny from Gannon because Gannon consented to pass

/ / /

title to Schroeder, and the crime of theft by false pretenses was complete when he did so by shipping the silver.

The larceny theory presented in this case is more accurately viewed as being "factually inadequate" – i.e., "a theory that, while legally correct, has no application to the facts of the case . . . ." (*Perez, supra*, 35 Cal.4th at p. 1233.) The prosecutor in closing argument told the jury there were two theories of theft and stated: "Now, these two theories are theft by larceny and theft by false pretenses. *The one that's supported by the evidence is theft by false pretenses.* But you can also get to theft by larceny." [FN omitted] (Italics added.) Thus, the prosecutor essentially admitted in the italicized statement that the theory of theft by larceny was factually inadequate.

Error in giving an instruction that is a correct statement of law but has no application to the facts of the case is an error of state law subject to the harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Guiton, supra*, 4 Cal.4th at pp. 1129–1130.) "Under *Watson*, reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*Guiton*, at p. 1130.) In cases where the jury was presented a factually inadequate theory along with one or more factually adequate theories, "the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Ibid.*)

Our review of the entire record compels the conclusion that presentation of the factually invalid larceny theory was not prejudicial under the *Guiton* test because it is not reasonably probable that the jury found the Boegeman guilty on solely that theory. It is far more likely that the jury convicted him as a conspirator in a theft by false pretenses, which was the prosecution's main theory. As the prosecutor correctly stated in closing argument, "The [theory] that's supported by the evidence is theft by false pretenses."

(Lodgment No. 1, ECF No. 7-1 at 4-7.)

/ / /

/ / /

/ / /

/ / /

The jury was instructed on the prosecution's theory of theft by larceny, in pertinent part, as follows:

To prove the defendant is guilty of [theft by larceny], the People must prove that:

> 1. The defendant took possession of property owned by someone else;

> 2. The defendant took the property without the owner's or owner's agent's consent;

> 3. When the defendant took the property he intended to deprive the owner of it permanently or to remove it from the owner's or owner's agent's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property;

AND

> 4. The defendant moved the property, even a small distance, and kept it for any period of time, however, brief.

An agent is someone to whom the owner has given complete or partial authority and control over the owner's property.

(Lodgment No. 7, ECF No. 7-14 at 78-79.)

The jury was instructed on the prosecution's theory of theft by false pretenses, in pertinent part, as follows:

To prove that the defendant is guilty of this crime, the People must prove that:
> 1. The defendant knowingly and intentionally deceived a property owner or the owner's agent by false or fraudulent representations or pretense;

> 2. The defendant did so intending to persuade the owner or the owner's agent to let the defendant or another person take possession and ownership of the property;

AND

17cv0861 GPC (KSC)

3. The owner let the defendant or another person take possession and ownership of the property because the owner or the owner's agent relied on the representation or pretense.

You may not find the defendant guilty of this crime unless the People have proved that:

Testimony from two witnesses or testimony from a single witness along with other evidence supports the conclusion that the defendant made the pretense.

*Property* includes money, labor, and real or personal property.

A *false pretense* is any act, word, symbol, or token the purpose of which is to deceive.

Someone makes a false pretense if, intending to deceive, he or she does one or more of the following:

1. Gives information he knows is false;

OR

2. Makes a representation, recklessly without information that justifies a reasonable belief in its truth;

OR

3. Does not give information when he or she has the obligation to do so;

OR

4. Makes a promise not intending to do what he or she promises.

Proof that the representation or pretense was false is not enough by itself to prove that the defendant intended to deceive.

Proof that the defendant did not perform as promised is not enough by itself to prove that the defendant did not intend to perform as promised.

17cv0861 GPC (KSC)

An owner or an owner's agent relies on false pretense, if the falsehood is an important part of the reason the owner or agent decides to give up the property. The false pretense must be an important factor, but it does not have to be the only factor the owner or agent considers in making the decision. If the owner or agent gives up property some time after the pretense is made, the owner or agent must do so because he or she relies on the pretense.

An *agent* is someone to whom the owner has given complete or partial authority and control over the owner's property.

(Lodgment No. 14, ECF No. 7-14 at 81-83.)

As he did in state court, Boegeman argues the larceny instruction was a legally invalid theory because under California law, Gannon relinquished title to the silver when he shipped it to Schroeder and thus the elements of larceny could not be satisfied. (Pet., ECF No. 1 at 6, 32-40.) Legally invalid theories incorrectly describe the elements of a crime or burden of proof. *See Yates v. United States*, 354 U.S. 298 (1957); *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (finding such jury instructions to be trial, not structural error, and reviewing the error under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1991), i.e., whether the error had a substantial and injurious effect on the jury's verdict). Factually invalid theories are those that are not supported by the evidence presented at trial. *Griffin v. United States*, 502 U.S. 46, 56 (1991). As the Court in *Griffin* noted:

Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law – whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence. [citations omitted].

*Id.* at 60.

///

The *Griffin* court went on to state that while it is preferable for a court to remove from consideration a theory of guilt that is not supported by sufficient evidence, "[t]he refusal to do so . . . does not provide an independent basis for reversing an otherwise valid conviction." *Id.* at 60.

The state court's conclusion that the larceny instruction was a factually invalid theory, not a legally invalid one, and that the error was therefore one of state law only, was consistent with *Griffin*. The larceny instruction given to Boegeman's jury did not incorrectly state the elements of the crime or the burden of proof. Rather, the facts as presented at trial did not support a conviction for larceny because Gannon voluntarily relinquished title to the silver under false pretenses, and transferred title to Schroeder when he shipped the silver. Federal habeas relief is not available for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991); *see also* 28 U.S.C. § 2254(a).

Even if this Court were to conclude the erroneous jury instruction rose to the level of a federal constitutional claim, Boegeman would not be entitled to relief. Instructional error can form the basis for federal habeas corpus relief only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Cupp v. Naugh'ten*, 414 U.S. 141, 146 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The allegedly erroneous jury instruction cannot be judged in isolation, however. *Estelle*, 502 U.S. at 72. Rather, it must be considered in the context of the entire trial record and the instructions as a whole. *Id.* The theft by larceny instruction required the jury to find that the defendant took the property without the owner's consent, while the theft by false pretenses instruction required the jury to find that the owner gave the property to the defendant relying on a false representation by the defendant. (Lodgment No. 14, ECF No. 7-14 at 78-79, 81-83.) The jury was also instructed that in order to convict Boegeman, they were required to find that the prosecution had proven every element of the offenses beyond a reasonable doubt. (*Id.* at 58.) A jury is presumed to follow the instructions it is given. *Richardson v. Marsh*, 481

U.S. 200, 211 (1987). The evidence presented at trial established that Gannon consensually transferred the silver to Schroeder under a false belief that Schroeder would pay him for it and not that Boegeman took the silver without Gannon's consent. As the Supreme Court noted in *Griffin*, the jury was "well equipped" to assess the facts presented at trial and conclude that the consent element of the larceny instruction was not applicable. *Griffin*, 502 U.S. at 60. Thus, considering the instructions as a whole as this Court is required to do under *Estelle*, the erroneous jury instruction did not " 'by itself so infect[] the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw*, 255 F.3d at 971; *Henderson*, 431 U.S. at 154.

Moreover, Boegeman has not established he would be entitled to relief even if the jury instruction error was one of federal constitutional dimension. The Supreme Court held in *Hedgpeth* that jury instruction errors are trial errors subject to review under the *Brecht* standard, that is, whether the error had a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 623. Because the evidence so clearly supported a conclusion that Boegeman was guilty of theft by false pretenses, the erroneous theft by larceny instruction did not have such an effect. Douglas Goll, a former neighbor of Boegeman and Schroeder, testified Boegeman told him that a person could order items online, fail to sign for the delivery of the package, and then claim they were never delivered. (Lodgment No. 7, vol. 3, ECF No. 7-9 at 26-27.) The purpose of this was to get one's money back and still keep the item or to have a duplicate item sent. (*Id.* at 27.) Gannon testified he had an extensive conversation with Schroeder about the silver flatware. They agreed upon a price, Gannon successfully charged the amount to a Visa card number Schroeder gave him and sent the flatware to Schroeder via FedEx. (*Id.* at 44-46.) The FedEx delivery person, Steven Milner, testified he delivered the package sent by Gannon to Boegeman and that Boegeman signed for the delivery. (*Id.* at 78.) Milner also identified Boegeman in a photo lineup as the individual he delivered the package to. (*Id.* at 64.) Although Boegeman testified he was in Los Angeles with Schroeder and others when the package was delivered, on rebuttal, the prosecution

presented cell phone evidence that contradicted Boegeman's testimony and showed he was not in Los Angeles as he claimed. (Lodgment No. 7, vol. 5, ECF No. 7-11 at 33-35.) Given these facts, the Court is not in "grave doubt" about the effect of the error on Boegeman's trial. *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).

For the foregoing reasons, the Court concludes the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Boegeman is not entitled to relief as to this claim.

### 2. *Aiding and Abetting Instruction*

In claim two, Boegeman argues the state court erred by including the terms "aiding and abetting" in the jury instructions and failing to define them. (Pet., ECF No. 1 at 7, 41-48.) Specifically, he contends the instructions told the jury they could convict him of grand theft even if he was not present during the theft if they concluded he aided and abetted the theft. (*Id.*) Boegeman contends that without this definition, the jury could have convicted him of theft via an aiding and abetting theory without finding he knew about the theft and intended to facilitate it. (*Id.*) Respondent contends this ground does not state a federal constitutional claim and, in any event, the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 6-1 at 18-25.)

Boegeman raised this claim in the petition for review he filed in the California Supreme Court, which summarily denied it. (Lodgments Nos. 5-6, ECF Nos. 7-5–7-6.) Accordingly, this Court must "look through" to the state appellate court's decision denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court wrote:

> The People acknowledge that a court's failure to properly instruct the jury on the elements of aiding and abetting is subject to review under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Reyes* (1992) 2 Cal.App.4th 1598, 1601-1602; *People v. Sarkis* (1990) 222 Cal.App.3d 23, 28-29.)

17cv0861 GPC (KSC)

Under that standard, error is harmless if the reviewing court determines beyond a reasonable doubt that the error did not contribute to the verdict. (*People v. Aranda* (2012) 55 Cal.4th 342, 367.) "When there is ' "a reasonable possibility" ' that the error might have contributed to the verdict, reversal is required." (*Ibid.*)

We conclude that to the extent the court erred by referencing aiding and abetting in its alibi-defense instruction without defining the elements of aiding and abetting, the error was harmless beyond a reasonable doubt – i.e., there is no reasonable possibility that Boegeman would have obtained a more favorable verdict on the grand theft charge had the court defined the elements of aiding and abetting in connection with its alibi instruction. The prosecution specifically informed the jury that its theory was conspiracy, and the court correctly and specifically instructed the jury on necessary mental state and acts to support a finding that Boegeman was guilty of theft by false pretenses as a member of a conspiracy with Schroeder. [FN 4]. The

> [FN 4: The court's conspiracy instruction informed the jury that to prove Boegeman [was guilty] of theft as a member of a conspiracy, the People had to prove that Boegeman "intended to and did agree with David Schroeder to commit theft by false pretenses[,]" and that Boegeman and Schroeder "committed at least one of the following overt acts to accomplish theft by false pretenses: [¶ 1) Ordered silverware from Dean Gannon without an intent to pay; [¶ 2) Received the delivered silverware but claimed never to have received it; [¶ 3) Withdrew payment for the silverware despite having received it."]

prosecutor did not argue or even mention aiding and abetting to the jury. Boegeman's main defense was not ignorance of any criminal scheme to steal Gannon's silver, but rather that he and Schroeder were not home on the date the evidence shows the silver was delivered to their residence. As the People note in their brief, during closing arguments the prosecutor and defense counsel collectively presented the jury with two possibilities: either Boegeman conspired with Schroeder to steal the silver or he was entirely innocent.

The jury obviously rejected Boegeman's and Schroeder's alibi evidence that they were in the Los Angeles area on April 26, 2014, and found credible Milner's testimony and the other evidence that Milner delivered the silver to Schroeder and Boegeman's address that day and

Boegeman signed for the delivery. Goll's testimony that Boegeman previously had explained to him the criminal scheme of ordering silver, not signing a confirmation of delivery slip when silver was delivered, and then claiming the silver had not been delivered eliminates any reasonable possibility that a juror might have had reasonable doubt as to whether Boegeman conspired with Schroeder to steal Gannon's silver and signed for the delivery of the silver with the intent of stealing it.

We conclude that given the evidence in this case, no rational juror properly instructed on the elements of aiding and abetting would have found that Boegeman did not know Schroeder intended to commit theft by false pretenses, or that he knew of Schroeder's criminal purpose but did not sign for the silver with the intent of helping committing, facilitating, or encouraging Schroeder's commission of the crime. There was simply no evidence to support a finding that Boegeman was ignorant of any plan to steal Gannon's silver by receiving it and then claiming it was not delivered. Accordingly, any error by the court in failing to instruct the jury on the elements of aiding and abetting was harmless beyond a reasonable doubt.

(Lodgment No. 1, ECF No. 7-1 at 3-4.)

The state court's application of *Chapman* to the jury instruction error means that the court concluded the error was of constitutional magnitude. *Chapman v. California*, 386 U.S. 18, 24 (1967). "When a *Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable.'" *Davis v. Ayala*, __ U.S. __, 135 S. Ct. 2187, 2199 (2015). Federal habeas relief is precluded "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Boegeman must also establish he suffered prejudice under *Brecht* as a result of the constitutional error. *Inthavong v. LaMarque*, 420 F.3d 1055, 1059, 1061 (9th Cir. 2005).; *see also Fry v. Pliler*, 551 U.S. 112, 120 (2007) ("in § 2254 proceedings a federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353, whether or not the state appellate court recognized the error

17cv0861 GPC (KSC)

and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman [v. California ]*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705") Thus, Boegeman must demonstrate both that the state court's denial of his claim based on *Chapman* "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103, and that the resulting error had a substantial and injurious effect on the verdict. *Brecht*, 507 U.S. at 623.

Boegeman presented an alibi defense by claiming he was in Los Angeles and not at his home when the package of silver flatware was delivered to his address. The aiding and abetting language was included with the instruction on the alibi defense and read as follows:

> The People must prove that the defendant committed Grand Theft in violation of Penal Code section 487(a) as charged in Count 1. The defendant contends he did not commit this crime and was somewhere else when the crime was committed. The people must prove that the defendant was present and committed the crime with which he is charged. The defendant does not need to prove he was elsewhere at the time of the crime.
>
> If you have a reasonable doubt about whether the defendant was present when the crime was committed, you must find him not guilty.
>
> However, the defendant may also be guilty of Grand Theft in violation of Penal Code section 487(a) as Charged in Count 1, if he aided and abetted or conspired with someone else to commit the crime. If you conclude that the defendant aided and abetted or conspired to commit grand theft, then he is guilty even if he was not present when the crimes were committed.

(Lodgment No. 8, ECF No. 7-14 at 87.)

The instructions contained no explanation of what "aiding and abetting" meant, and specifically no instruction that in order to convict Boegeman on an aiding and abetting theory, the jury was required to find that he "[knew] of the perpetrator's unlawful purpose and . . . specifically intend[ed] to, and d[id] in fact, aid, facilitate,

///

22

promote, encourage, or instigate the perpetrator's commission of that crime."
(CALCRIM No. 401.)

Because the instruction did not define what aiding and abetting meant in a legal sense, it is possible the jury could have convicted Boegeman of aiding and abetting the theft without finding the necessary intent. The state court supported its conclusion that the error was harmless under *Chapman* by noting that the prosecutor did not argue a theory of guilt based on aiding and abetting and that Boegeman's defense was not that he was ignorant of the plan to steal the silver but that he was not present when the silver was delivered. (Lodgment No. 1, ECF No. 7-1 at 4.) While it is true the prosecutor did not mention an aiding and abetting theory during his closing argument, it is not clear to this Court that the failure to do so negated the incorrect aiding and abetting theory contained in the instructions. Moreover, the potential for the jury to convict Boegeman on an aiding and abetting theory without finding the necessary intent was compounded by the fact that the erroneous aiding and abetting instruction was included in the alibi instruction and informed the jury that they could still convict Boegeman of theft even if he was not present during the crime if he aided and abetted the theft. The jury sent a note during deliberations asking to have Boegeman's testimony about the whereabouts of his cell phone on the day of the crime read back to them, indicating they were focused on the credibility of Boegeman's alibi defense. (Lodgment No. 8, ECF No. 7-14 at 51.) Given that alibi was the only defense presented, the inclusion of the erroneous aiding and abetting instruction with the alibi instruction would logically serve to highlight the aiding and abetting theory to the jury, not render it inapplicable as the state court suggested.

Nevertheless, this Court must determine not whether the state court's application of *Chapman* was simply wrong but objectively unreasonable, that is, that the decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103. Were this Court applying *Chapman* directly to the instruction error, it may have come to a different conclusion. Under the extraordinarily

17cv0861 GPC (KSC)

1  deferential standard of AEDPA, the Court cannot say the state court's application of

2  *Chapman* was unreasonable. *Yarborough*, 540 U.S. at 4.

3         Even if the state court's application of *Chapman* was unreasonable, Boegeman has

4  not established the error had a substantial and injurious effect on the jury's verdict.

5  *Brecht*, 507 U.S. at 623. The evidence that Boegeman knew about and participated in the

6  theft of the silver flatware was strong. As detailed above, Goll testified Boegeman told

7  him a person could order an item online, claim to have never received the item, then have

8  the money spent on the item returned and keep the item or have a second item shipped.

9  (Lodgment No. 7, vol. 3, ECF No. 7-9 at 26-27.) Gannon testified that after discussing a

10 price for the silver flatware, Schroeder gave him a Visa card number that Gannon

11 successfully charged; Gannon then shipped the flatware to Schroeder via FedEx but the

12 Visa charge was later reversed. (*Id.* at 44-46.) Milner, the FedEx delivery person,

13 identified Boegeman as the person to whom he delivered the package sent by Gannon and

14 that Boegeman signed for the delivery. (*Id.* at 64, 78.) Boegeman claimed he was in Los

15 Angeles with Schroeder and others when the package was delivered, but there were

16 inconsistencies in Boegeman's, Schroeder's and their companions' testimony, and the

17 prosecution presented cell phone evidence that showed Boegeman's phone was not in

18 Los Angeles as he claimed. (Lodgment No. 7, vol. 5, ECF No. 7-11 at 33-35.) Given the

19 strength of the evidence that Boegeman knew about and participated in the theft by false

20 pretenses of the silver flatware, the jury would have found Boegeman had the appropriate

21 intent had they been properly instructed as to the aiding and abetting theory. *Brecht*, 507

22 U.S. at 623. Accordingly, Boegeman is not entitled to relief as to this claim.

23 *Yarborough*, 540 U.S. at 4.

24 **IV.  CONCLUSION**

25        The Court submits this Report and Recommendation to Chief United States

26 District Judge Gonzalo P. Curiel under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2

27 of the United States District Court for the Southern District of California.

28 / / /

**IT IS HEREBY RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than ***April 27, 2018*** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than ***May 11, 2018***. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: March *26*, 2018

Hon. Karen S. Crawford
United States Magistrate Judge